**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER CITY PUBLIC CHARTER SCHOOL<br><br>    Plaintiff,<br><br> v.<br><br><br>TAMIKA ARCHER,<br><br>    Defendant. | Civil Action No. 25-521 (EGS) |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Center City Charter School ("Center City") seeks relief from an adverse Hearing Officer Determination under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* Pending before the Court are the parties' Cross Motions for Summary Judgment. Upon careful consideration of the motions, oppositions, and replies thereto, the applicable law, the Administrative Record, and for the reasons explained below, the Court **GRANTS** Center City's Motion for Summary Judgment and **DENIES** Ms. Archer's Cross Motion for Summary Judgment.

I.    **Background**

A.    **Factual**[1]

T.A. is a child with a primary disability of Developmental Delay. Administrative Record ("AR"), ECF No. 6-1 at 224. On May 1, 2024, an Initial Individualized Education Program ("IEP") meeting was held at his school at the time, AppleTree Learning Center ("AppleTree"). *Id*. The IEP stated that

> T[A] demonstrates challenges in several areas of social-emotional development and requires frequent support from adults to follow/participate in classroom routines safely and successfully. In particular, he demonstrates significant difficulty attending/concentrating during lessons and academic tasks and often responds impulsively when he can't have/do something he wants, for example, screaming, pushing/throwing furniture, and/or other signs of significant distress. T[A]'s behavior can cause him to miss instructional time or not be able to participate in learning opportunities.

*Id*. at 225. The IEP set forth various special education and related services to address T.A.'s developmental delays. *Id*. at

---

[1] Neither party submitted a Statement of Material Facts as to which there is no genuine issue pursuant to Local Civil Rule 7(h). Since in an IDEA case, "[f]actual findings from the administrative proceeding are to be considered prima facie correct," *D.R. ex rel. Robinson v. District of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009); and since cross motions for summary judgment in IDEA cases do not follow the normal summary judgment procedure but rather are based on the Court's review of the Administrative Record, the Court's factual background is drawn from the Hearing Officer's Findings of Fact, *see* AR, ECF No. 6-1 at 404-409; and the Court's review of the Administrative Record.

241. In particular, the IEP provided that T.A. would be provided specialized instruction in the general education setting for three hours per week, and specialized instruction outside of the general education setting for one hour per week. *Id.* at 241. The time frame for these services were beginning May 1, 2024, and ending April 30, 2025. *Id.* at 241.

Ms. Archer enrolled T.A. in Center City for the 2024-25 school year, and Center City reviewed T.A.'s IEP and behavior improvement plan ("BIP") for implementation at Center City. *Id.* at 544. The first day of the 2024-25 school year was August 26, 2024. *Id.* at 516. Beginning the second day of classes, the Special Education Director had safety concerns based on T.A.'s leaving the classroom and disrupting the classroom environment. *Id.* at 406. Classroom staff reported that it was difficult for T.A. to remain in his seat and assigned areas, that he screamed and rolled on the floor in the classroom, and that he got in other children's faces and interfered with their work. *Id.* at 406. Although an additional teacher was provided to provide one to one support for T.A., he could not keep himself under physical control in the classroom. *Id.* at 406. When T.A. left the classroom, he would run away from adults, run up and down the hallways and stairs, climb bannisters, and run into other classrooms. It would take three to four adults to find T.A. and take him to a safe place. *Id.* at 407.

3

By September 12, 2024, school administrators—the principal, Special Education Coordinator and Special Education Director were in contact with Ms. Archer about possible alternative educational settings for T.A., including D.C. Public Schools, nonpublic schools, and other charter schools. *Id*. at 407. Ultimately, however, Center City decided that it would create a self-contained classroom for T.A. and one other child. *Id*. at 407. The self-contained classroom would be staffed by a special education teacher and an instructional teaching assistant. *Id*. at 407.

The Special Education Coordinator discussed the self-contained classroom with Ms. Archer on Friday, September 20, 2024, and explained that T.A.'s hours in specialized instruction outside of the general education setting in the IEP would need to be amended to reflect an increase in those hours. *Id*. at 529. When Ms. Archer brought T.A. to Center City the morning of September 23, 2024, the Special Education Coordinator explained to her that T.A. could not be moved to the self-contained classroom unless the amendment to the IEP increasing T.A.'s hours of specialized instruction outside of the general education setting was signed. *Id*. Ms. Archer wanted T.A. to start in the self-contained classroom that morning, and so she signed the document. *Id*. Ms. Archer later testified that she

4

felt "kind of pressured" into signing the amendment, *id*. at 444; and that she "didn't understand the IEP," *id.* at 440.

T.A.'s IEP Team, including Ms. Archer, met that afternoon. *Id*. at 413. The Special Education Coordinator testified that the meeting was held to review T.A.'s BIP, to talk about T.A.'s behaviors and how Center City was addressing them, and to explain the amendment to the IEP. *Id*. at 552. Staff from AppleTree attended the meeting at the request of Ms. Archer and provided information about strategies they had used with T.A. *Id*. at 552. The meeting also included discussion of T.A.'s placement in the self-contained classroom. *Id.*

On September 24, 2024, Ms. Archer sent an email to the Special Education Coordinator requesting another IEP meeting. *Id*. at 408. She stated that she felt rushed and pressured to sign documents before the IEP meeting and that she would like to review the whole IEP. *Id*. On September 25, 2024, Ms. Archer filed a request for a Due Process Hearing. *Id*. at 4-12. Ms. Archer stated that she disagreed with T.A.'s placement outside of the general education setting. *Id*. at 9.

The Due Process hearing was held on November 21 and 22, 2024, and the Hearing Officer's Determination was issued on November 26, 2024. *Id*. at 402.

### B. Procedural

The Complaint was filed on February 21, 2025, *see* Compl., ECF No. 1; and the Administrative Record on June 16, 2025, *see* AR, ECF No. 6. Center City filed its Motion for Summary Judgment ("MSJ") on July 18, 2025. *See* MSJ, ECF No. 7. Ms. Archer filed her Opposition and Cross Motion for Summary Judgment ("XMSJ") on August 8, 2025. *See* XMSJ, ECF No. 8. Center City filed its Opposition and Reply on August 29, 2025, *see* Opp'n, ECF No. 10; and Ms. Archer filed her Reply on September 11, 2025, *see* Reply, ECF No. 12. The cross motions are ripe and ready for the Court's adjudication.

## II. Statutory Framework and Legal Standard

### A. The IDEA

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The IDEA seeks to guarantee children with disabilities a FAPE by requiring states and the District of Columbia to institute a variety of detailed procedures. "'[T]he primary vehicle for implementing'" the goals of the statute "'is the [IEP], which the [IDEA] mandates for each child.'" *Harris v. District of Columbia,* 561 F. Supp. 2d 63, 65 (D.D.C.

6

2008) (citing *Honig v. Doe,* 484 U.S. 305, 311-12, 108 (1988)). An IEP is a written statement that includes, among other things: (i) a statement of the child's present levels of academic achievement and functional performance; (ii) a statement of measurable annual goals, including academic and functional goals; (iii) a description of the child's progress in meeting those goals; (iv) a statement of the special education and related services and supplementary aids and services to be provided to the child; and (v) an explanation of the extent, if any, to which the child will not participate with nondisabled children in any regular classes. *Id.* § 1414(d)(1)(A)(i). An "IEP Team"—which consists of the parents of the child with disability, not less than one regular education teacher of the child (if applicable), not less than one special education teacher or provider of the child, and a representative of the local education agency—is charged with developing, reviewing, and revising a child's IEP. *See id.* § 1414(d)(1)(B) (defining an IEP Team). Because the IEP must be "tailored to the unique needs" of each child, *Bd. of Educ. v. Rowley,* 458 U.S. 176, 181, 690 (1982), it must be regularly revised in response to new information regarding the child's performance, behavior, and disabilities, and must be amended if its objectives are not met. *See* 20 U.S.C. §§ 1414(b)-(d). The IDEA requires an IEP to be "in effect" for each child with a disability in the agency's

jurisdiction "[a]t the beginning of each school year." 20 U.S.C. § 1414(d)(2)(A).

### B. Standard of Review

Pursuant to the IDEA, "[a]ny party aggrieved by the findings and decision" rendered during administrative proceedings may "bring a civil action" in state or federal court without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2), (i)(3)(A). "The Court's approach toward IDEA administrative decisions diverges somewhat from its role in the typical lawsuit." *Davis v. District of Columbia*, 244 F. Supp. 3d 27, 37 (D.D.C. 2017). "Although the [cross motions] bear the familiar placard of 'summary judgment,' judicial review of hearing-officer decisions [HOD] does not follow 'a true summary judgment procedure.'" *Id.* (quoting *L.R.L. ex rel. Lomax v. District of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) (citation omitted)). Under IDEA, the reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *D.R. ex rel. Robinson v. District of Columbia*, 637 F. Supp. 2d 11, 15–16 (D.D.C. 2009) (quoting 20 U.S.C. § 1415(i)(2)(C)).

"On review of an HOD, the burden of proof falls upon the party challenging the administrative determination, who must 'at

least take on the burden of persuading the court that the hearing officer was wrong.'" *D.R. ex rel. Robinson v. District of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009) (quoting *Reid ex rel. Reid v. Dist. of Columbia,* 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C. Cir. 1989)).

"The preponderance-of-the-evidence standard of review, the Supreme Court has held, does not authorize unfettered de novo review." D.R. ex rel. Robinson, 637 F. Supp. 2d at 16 (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). "Rather, consideration of the record impliedly requires courts to give 'due weight' to the administrative proceedings, [citation omitted]*,* and '[f]actual findings from the administrative proceeding are to be considered prima facie correct.'" *Id.* (quoting *S.H. v. State-Operated Sch. Dist. Of Newark,* 336 F.3d 260, 270 (3d Cir. 2003). "Therefore, courts may not substitute their own views for those of the hearing officer," *Id.* (citing *see Rowley,* 458 U.S. at 206, 102 S. Ct. 3034; *Shaw v. District of Columbia,* 238 F. Supp. 2d 127, 136 (D.D.C. 2002)), "and a court upsetting a hearing officer's decision 'must at least explain its basis for doing so,'" *Id.* (quoting *Kerkam,* 862 F.2d at 887). The deference to the HOD "is at its apex when the court is reviewing matters of 'educational

policy' . . . and at its nadir when a decision lacks thorough reasoned findings or opines on a purely legal question." *Davis*, 44 F. Supp. 3d at 38 (citations omitted).

### III. Analysis

#### A. There Was No Procedural Violation of the IDEA

The Hearing Officer found "that [Center City] did not comply with the IDEA's procedural requirements in changing [T.A.'s] educational placement and that this resulted in a denial of FAPE to the student." AR, ECF No. 6-1 at 410. For the reasons explained below, the Hearing Officer's legal conclusion was in error.

The procedural safeguards set forth in the IDEA require placement decisions to be "made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." 34 C.F.R. § 300.116(a). The Hearing Officer found that Center City failed to comply with the this procedure when it changed T.A's special education hours to take place mostly in the self-contained classroom because it did not convene T.A.'s IEP team before the September 23, 2024 placement decision. AR, ECF No. 6-1 at 411.

According to Center City, it was not obligated to convene T.A.'s IEP team because Ms. Archer agreed to the placement decision without convening an IEP team meeting. *Id*. at 411-412.

Therefore, Center City and Ms. Archer could agree to amend T.A.'s IEP pursuant to 34 C.F.R. § 300.324(a)(4):

> [i]n making changes to a child's IEP after the annual IEP Team meeting for a school year, the parent of a child with a disability and the public agency may agree not to convene an IEP Team meeting for the purposes of making those changes, and instead may develop a written document to amend or modify the child's current IEP.

The regulations further provide that pursuant to this regulation, "[c]hanges to the IEP may be made . . . by amending the IEP rather than by redrafting the entire IEP." 34 C.F.R. § 300.324(a)(6).

The Hearing Officer agreed that Center City received Ms. Acher's signature on the IEP Amendment Form the morning of September 23, 2024, and in doing so intended to amend the IEP without convening an IEP team meeting based on Ms. Archer's agreement. *Id.* at 412. But the Hearing Officer determined that the procedure for changing an IEP without convening an IEP team meeting did not apply because the IEP from T.A.'s prior school was an "initial" IEP developed by that school "at the end of the 2023-2024 school year" and no annual IEP team meeting had been held for the 2024-2025 school year. *Id.* at 412.

The Court concludes that the Hearing Officer's determination that the IEP could not be amended because no annual IEP team meeting had been held for the 2024-2025 school

11

year was in error. Here, the annual IEP Team meeting took place at AppleTree on May 1, 2024. AR, ECF No. 6-1 at 225. The time frame for T.A.'s IEP was May 1, 2024, through April 30, 2025. *Id*. at 241. Since the IEP did not expire until April 30, 2025, changes could be made by amendment to the IEP in September 2024. *See K.A. ex rel. F.A. v. Fulton Cnty. Sch. Dist.*, 741 F.3d 1195, 1202 (11th Cir. 2013) (explaining that "[i]f changes are needed before the IEP expires, amendments may be made either by a reconvened team, or by a written agreement between the parents and the school district.").

The Hearing Officer read into the regulation a requirement for Center City to hold the annual IEP team meeting for the 2024-2025 school year sometime after the start of the 2024-2025 school year even though T.A.'s IEP did not expire until April 30, 2025. Such a requirement does not exist. Other than citing the applicable regulation, the Hearing Officer cited no legal authority to support his legal conclusion. *See* AR, ECF No. 6-1 at 411-413. There is no indication in the record that when T.A. enrolled in Center City, it did not consider the May 1, 2024, through April 30, 2025 IEP to be the IEP in effect. The IDEA requires an IEP to be in "effect" "[a]t the beginning of each school year." 20 U.S.C. § 1414(d)(2)(A). This is exactly the situation with T.A.'s IEP—it was in effect at the beginning of the 2024-2025 school year because it did not expire until April

30, 2025. Accordingly, changes to T.A.'s IEP could be made by amendment pursuant to 34 C.F.R. § 300.324(a)(4).

Ms. Archer urges the Court to adopt the Hearing Officer's interpretation of the regulation, arguing that the Hearing Officer's interpretation is consistent with the plain meaning of term "school year" in the regulation. *See* XMSJ, ECF No. 8 at 9-10. Ms. Archer also argues that under Center City's interpretation, the language "for a school year" is rendered superfluous. *Id.* at 10. Ms. Archer cites no authority in support of her arguments other than citing caselaw that supports the use of a dictionary to ascertain the ordinary meaning of a term, and the applicable statute and regulations. *See id.* at 9-11.

As an initial matter, there is no dispute over the meaning of the term "school year." The question is whether the IEP could be amended with Ms. Archer's agreement without an IEP team meeting. The Court rejects Ms. Archer's arguments. She ignores the fact that the IEP itself states that its time frame was May 1, 2024, through April 30, 2025. AR, ECF No. 6-1 at 241. Furthermore, she provides no legal authority for the proposition that the IDEA required Center City to hold the annual IEP team meeting for the 2024-2025 school year sometime after the start of that school year even though T.A.'s current IEP did not expire until April 30, 2025. The IDEA requires there to be an IEP in effect for each child with a disability in the

13

agency's jurisdiction at the beginning of each school year. 20 U.S.C. § 1414(d)(2)(A). This is exactly what happened here— T.A.'s IEP was in effect at the beginning of the 2024-2025 school year because it did not expire until April 30, 2025.

T.A.'s IEP Team met after the amendment was signed, during the afternoon of September 23, 2024. AR, ECF No. 6-1 at 413. The Special Education Coordinator testified that that the meeting was held to review T.A.'s BIP, to talk about T.A.'s behaviors and how Center City was addressing them, and to explain the amendment to the IEP. *Id.* at 552. Staff from AppleTree attended the meeting at the request of Ms. Archer, *id.* at 655; and provided information about strategies they had used with T.A. when he was at AppleTree. *Id.* at 552. The meeting also included discussion of T.A.'s placement in the self-contained classroom. *Id.*

The Hearing Officer found that "[t]he IEP team did not agree that [T.A.] needed to be in a full-time self-contained program." *Id.* at 408. In support, he cited the testimony of the Special Education Coordinator at Center City generally. *Id.* The Special Education Coordinator was asked whether "the team agree[d] at this meeting that [T.A.] needed to be in self-contained or non-public." *Id.* at 532. The Special Education Coordinator responded "no"; but it is not clear whether she is responding "no" to whether there was agreement about T.A. being

14

in a self-contained classroom, whether there was agreement about him being moved to a nonpublic school, or both.

The Administrative Record indicates that there *was* agreement among the IEP team that T.A. needed to be in the self-contained classroom. First, and as background, the Special Education Coordinator and Ms. Archer discussed the placement on Friday, September 20, 2024, and the Special Education Coordinator explained that the IEP would need to be amended. *Id.* at 529. Second, Ms. Archer requested and agreed to T.A.'s placement in the self-contained classroom. *Id.* Even though Ms. Archer subsequently had second thoughts about the placement and later testified that she felt "kind of pressured"; she did request the placement and she did sign the amendment. *See id.* at 444, 529. Third, the Special Education Coordinator testified that the placement "decision was made between the teachers, myself—it was discussed between the teachers, myself, with mom, with the principal." *Id.* at 529. Fourth, T.A.'s Special Education teacher at Center City testified that he was in agreement with moving T.A. to the self-contained classroom. *Id.* at 623. Fifth, the Director of Special Education at Center City testified that the placement was appropriate. *Id.* at 641.

T.A.'s Special Education teacher from AppleTree did testify, based on her attendance at the September 23, 2024 meeting, that there was disagreement about moving T.A. to the

15

self-contained classroom, but she was not specific about whether the disagreement was among T.A.'s IEP team at AppleTree, or the IEP team at Center City. *Id*. at 459.

For these reasons, and because the amendment to T.A.'s IEP was consistent with 34 C.F.R. § 300.324(a)(4), the Hearing Officer's legal conclusion that "the evidence does not establish that [T.A.'s] IEP team made the placement decision as required by 34 C.F.R. § 300.116(a)," *id*. at 413; was in error.

### B. The Evidence Does Not Indicate That the Purported Violation Resulted in a Denial of FAPE

When a procedural violation is established, "the hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies—

> (i)     Impeded the child's right to a FAPE;
>
> (ii)    Significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or
>
> (iii)   Caused a deprivation of educational benefit.

34 C.F.R. § 300.513(1)(2).

The Hearing Officer found that T.A. did not receive a FAPE because "[i]n bypassing IEP team decision making, [Center City] significantly impeded [Ms. Archer's] opportunity to participate in the decision making process." AR, ECF No. 6-1 at 413. The

16

Court has concluded above that the IEP was properly amended and that 34 C.F.R. § 300.116(a) was not violated. Therefore, the IEP team decision making process was not bypassed. Moreover, the evidence demonstrates that Ms. Archer requested and agreed to the self-contained classroom setting. Ms. Archer argues that her "earlier decision, made under pressure and without full understanding controlled the outcome" and so her decision making rights were denied. XMSJ, ECF No. 8 at 14. The Court acknowledges that Ms. Archer later testified that she felt "kind of pressured" into signing the Amendment; AR, ECF No. 6-1 at 444; and that she "didn't understand the IEP," *id.* at 440. However, the evidence that Ms. Archer requested the placement and signed the amendment is uncontroverted. For these reasons, T.A. was not denied a FAPE.

**IV.  Conclusion**

For the reasons explained above, Center City's Motion for Summary Judgment, ECF No. 7, is **GRANTED**; and Ms. Archer's Cross Motion for Summary Judgment, ECF No. 8, is **DENIED.**

An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
           **United States District Judge**
           **March 30, 2026**

17